We'll hear argument now in the case of United States v. Klund. Mr. Klund was sentenced to 96 months on each of the counts of wire fraud to which he belatedly pled guilty, and additionally to 24 months consecutive to those wire fraud sentences for aggravated identity theft. It is our position on appeal that the guidelines were miscalculated in two different ways. First, the district court did not offset the face value of the never received any payment towards those contracts and added the face value of those contracts to his loss calculation. I did not squarely object to that, so I think review is for plain error. Can I ask you, it's my understanding from the pre-sentence report that there were some nothing had been shipped, and so to the extent the department would have paid those invoices, then surely it is the full face value of the invoice, and I want to know how we know for this group that you just described whether anything was shipped that we could be using for an offset. Your Honor, I don't think that there is any real breakdown in the record. There are mentions in the pre-sentence report and in the government's disclosures that some of the parts were defective. There is discussion of there being, I think, 95 PQDRs or reports of defective parts. So those are shipments with defective parts, which maybe we would analogize to something for which there is no offset, and I realize that the way the system was supposed to work, the department wasn't going to pay until it had received things, but on the other hand, as I said, I thought I saw in the PSR that it didn't always work that way and that there were some invoices submitted when there, in fact, had been just totally fraudulent, right? No shipment at all had happened. I don't think that you're wrong, Your Honor, but I don't think it's broken down in any way that's quantifiable. And that's where maybe plain error review matters because the district court is looking at this and saying, what am I supposed to do with these shipments? Do I just presume this 15% profit? Do I just assess the full value? So that, I'm not sure it was wrong. If we had known they were all representing non-shipped goods, then we would put the full value in, wouldn't we? Yes, I agree, Your Honor. If it were the case that Mr. Clinton somehow received payment for goods that he never shipped, then those would appropriately receive no offset, of course. But I don't think that there is any, because of the way that the government chose to approach the case, they never quantified that to any degree. I don't know if my friend Mr. Graber will be able to address that more in more detail. Okay. I mean, that's enough. So I think it just doesn't make any sense where the whole, what I view is that the district court essentially found the fact that a reasonable estimate of Mr. Clinton's profits was 15% of the contract price. The defense didn't challenge it. We didn't have any good basis to it. It seemed relatively reasonable, although the industry standards are somewhat lower. 12% to 13% is apparently the normal profit. So the government got to use a higher than apparently average estimate of profits. And, of course, that's really what the government loses out on, apart from the cases where there's allegations of perhaps things weren't shipped and he somehow got paid, which, as I think about it more, seems a little speculative. I'm going to say I cannot fathom what Clinton's potential profit had to do with the federal government's potential loss. The guidelines say loss and profit are different measures. Did anybody try to use the measure that would be used in commercial law, the cost of cover, what the military would have paid to get this stuff from somebody else? So I think that's contemplated in the guidelines, Your Honor. I asked a particular question. Did anybody try to use the cost of cover to estimate loss? I just want to make sure I understand what cost of cover is, Your Honor, because that's not a term that I'm familiar with from the commercial case. I think the answer, if you don't know what cover is, then the answer is going to be no. Yeah, I don't think that there was. It's an important concept in commercial law. Meaning I didn't get my stuff here, so I've got to get it somewhere else. You take it and you buy the item from somebody else so you can get some sense of whether the contract was a good one or a bad one or an indifferent one, and you get an objective measure. No, I don't think there was any effort to do that by either side, and there was also no procurement fraud guideline comment provides that the government can prove additional loss, what it costs to get the contract fulfilled, what it costs to get, you know, in the instance that there's bad parts, good parts instead, and they did not do that because they relied on the theories of loss calculation or estimation. So this is all about which band in the guidelines he falls within, right? You know, it's just using the numbers that the district court chose, it was a higher range than you think he should have had. Yes, which is why the argument is that it was a procedurally unreasonable sentence, right? And unlike cases where the defendant intends, even if it's impossible or absurd to think that the result could be achieved, there's really no evidence at all that Defendant Klund thought that somehow he was going to get the full contract price in any of these defense contracts. He knew, and I don't think there's any evidence in the record of the contrary, that he somehow even subjectively or speculatively thought, well, maybe I can get every penny of the face value of this without shipping any product. So it's different than, you know, this court has had cases where someone cold calls a brokerage house and proposes a preposterous scheme that's never going to work, but that's still the intended loss because it's what the defendant subjectively intended, and that this case is different in that respect. There's nothing we can point to, I don't think, that would show that Klund thought, oh, well, for some of these, I'm going to get all the money, and I'm not going to have to put up any money to buy things to manufacture into parts I can ship to the government, to the Department of Defense. Do you want to say anything about Rogue? Yes, please, Your Honor. So the government relied on Leahy and also the Giovanni case, I'm probably saying it wrong, for the proposition that because Rogue is a woman-owned company or represented to be a woman-owned company, that there's no offset for cost of goods. I think that the decisions in the sister circuits, specifically the Nagel decision and the Bikundi decision, which note that the offset for goods shipped is not specifically excluded by Application Note 3F, little Roman numeral 2, are persuasive and should apply here. There's nothing about the plain language of the Application Note that excludes the offset for goods that were actually shipped. So I think that the – and also the Giovenco case that the government relied on is just distinguishable because in Giovenco, the defendant literally went out and fraudulently obtained a certification that the business was minority-owned and Klund did no such thing. He said that it was a woman-owned business, but he did not actually obtain any sort of government certification to that end. He was surely signing papers that were given to the government that made that representation. Yes, he certainly made that representation, no doubt, but he did not – That's already a problem. I agree. He did fraud. But that's different than when you go out and actually get a certification or you get a fake license or something like that. That's not what he did, and that rule doesn't apply. So I see I've already burned through most of my rebuttal time, but I'm happy to answer more questions if the Court has any. Well, you've got 25 seconds for rebuttal. Thank you, Your Honor. Mr. Graber. May it please the Court. Good morning, Your Honor. My name is Dan Graber. I represent the government. I handle the case down below. Judge Easterbrook, your question about the commercial, the cover, I didn't go that route. The reason we went the route of the under Note 3A, we went with intended loss. The best indicator of his subjective intended loss was what he bid it out for. He bid, the department wanted goods. He came back and said, I will supply those goods for $7.4 million. And the Department of Defense didn't know they were making a deal with the devil. He was elbowing out everybody else so that nobody else could get 7 point, have the ability to make $7.4 million. Then they were in a contractual relationship with him for 7.4 million. They didn't know that they were in a contractual relationship with him. But they got some value for that. They did, and that's why under 3E we give them credit for that. And that's where there's a divergence here where we're saying, look, you get credit for what you shipped. We'll give you the cost for what you shipped, which, by the way, we came up with a 15% number. We had to reverse engineer that because there were no cost numbers. We asked them during the search warrant, do you have any cost reports? Do you have any tax returns? Do we know how to do the cost? 15% profit doesn't sound like anybody's loss, right? If somebody can fulfill a contract very cheaply, that doesn't mean that the other side has lost more money, right? The other side's loss is unaffected by that. But you seem to be willing to take that as a proxy. You haven't argued cover, and, of course, the government hasn't argued that everything he provided was worthless because the only thing the military can do with supplies tendered by a confessed, by an obvious fraudster, is throw them in the garbage, right? Once they found out who he was, then they did exactly that. Well, if they threw them in the garbage, then the loss is 100% of what they paid him, plus anything they planned to pay him, the stuff they would throw in the garbage. That didn't seem to be the burden of your argument, either in the district court or here. Correct. Yeah, well. Our position is that it's the bid amount, Your Honor, that that's what he wanted to take from the government was $7.4 million. We give him credit because he did provide some goods, so we give him credit for the cost of those goods. He's saying I should get credit for all of it. Look, I've just explained why profit is a terrible measure. Suppose somebody is so efficient at providing goods under a contract that he makes a 50% profit. Apple Computer clears about a 30% profit every year. Does that mean that their trading partners are suffering bigger losses than if a less efficient supplier makes only a 2% profit? It's just totally unrelated to the loss of the buyer. But this wasn't argued out in the district court and hasn't been argued out here. No, maybe what you can do is just build up, because I'm looking at your brief, you know, page 8. You say the government, you know, the district court finds that the government had met its burden to show a loss of approximately $5.7 million. And that's starting with 7.5, subtracting out, I gather, the value of what actually was delivered and assuming that everything else was just the bid amount because there was no showing that anything had been shipped. I mean, I don't know. You tell me. I mean, how do you get this number? Start with 7.4 because that's the bid amount. So he's telling the government that's how much money I got. Right. He says 7.4 minus 2.0 or 1.0 something. Well. Minus the value of what's delivered. And that's the intended loss under Note 3A. That's the way we're supposed to do it, Judge, is that's the intended loss. They want to go to gain. They want to go into profit. And you were perfectly happy to allow that on any goods that were actually delivered. Judge. That's why I'm so puzzled by the parties' positions in this case. Application Note 3E tells us we have to do that. It doesn't tell you you have to do that. It says when you look at it. It says that if there is no way to calculate loss. That's 3B. 3B says if you can't calculate loss, then go to gain, go to profit. 3E is the credit. 3E says you've got to give people credit for goods that you. For the value of the goods delivered. Correct. So I gave them credit for we reverse engineered what the cost of goods sold was for those goods that he provided. Now, he wants to have. The value of the goods delivered is what it costs in the market to get something. Not the profit somebody makes by delivering them. Correct. And I'm not saying profit. I'm glad you think I'm correct. I'm saying it's the cost to him. Not the cost of somebody else to make it, but his cost. He should be able to be. His cost is irrelevant. The party should have been talking about cover, but obviously they weren't. And that concept, Your Honor, isn't in the guidelines. The guidelines tell us follow 3A and then do 3A as the intended loss and then subtract out under 3E the credit, which was what we did. And that's what Judge Peterson did, and that's not error. What they're taking issue is is when you give me credit, you should give me credit for the goods that not only that I shipped, but that I intended to ship. And if you look at 3E application 03, it says you don't get credit for goods that you don't ship. You only get credit for goods that you do ship. And he comes up now on appeal with a brand-new argument saying, oh, no, I'm allowed to get credit for goods that I don't ship. And if you just take a 15% cut across the board, you come up with this new number, 1.12 million. The problem is that that's not what you advanced in the district court. You went down door number one, and by doing that, you closed off door number two. You accepted this methodology of going 3A minus 3E is the loss amount. They bought into that. Judge Peterson said, are you on board with that? Yeah, that's what we want to do. Their only claim down below with Judge Peterson was you should give us credit for Rogue because we don't believe Leahy and Giovanko apply, so you should give us credit for the Rogue goods. And Judge Peterson said, that's Seventh Circuit law. I can't. You don't get the credit for the goods under 3E because 3F says it qualifies under the government benefit rule. Benefit or regulatory approval, yeah. Correct, or under the regulatory approval rule. But they bought off on that down below. Now this new argument is coming up saying, well, we should get credit for the goods that we didn't even ship but that we intended to ship. And that's not the law. That's not the law under the guidelines, and it's not the law in the circuit. And that's why Judge Peterson didn't commit error, plain or otherwise, by not buying off on that. And just a last point on that, even if he had advanced that, there can't be plain error because that number, that 1.12 million number that they're coming up with in their brief, that's still lower than the actual loss amount. The actual loss amount was 2.9 million. If you look at 3A. That's just under the loss table. You need to get up to 3.5, right? Correct, but I'm just saying it says use intended loss or actual loss under 3A. Well, we went with intended loss because it was higher than actual loss, 5.6 higher than 2.9. He's saying, well, if you follow my new theory, my loss should only be 1.1. Well, even if the judge had done that, he still would have gone with the 2.9, not the 1.1. So that's why the judge didn't commit error, either following the 3A minus 3E and factoring in the 3F methodology or whether you go with, and he didn't err with the 3F, but he applied the Leahy and Giovanko correctly. Unless the court has any other questions. I'll sit down. Hearing none, thank you very much. Thank you. Anything further, counsel? I would just add that the 3A.2, the intended loss, is pecuniary harm that the defendant purposely sought to inflict. Klund's best outcome was getting the profit that he would make after shipping goods. It doesn't make sense to drive his sentence up because he didn't perform contracts where the government never got anything. Thank you. Thank you very much, counsel, and we appreciate your willingness to accept the appointment in this case. The case is taken under advisement.